UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL DEPOSIT INSURANCE ) Civil Case No. C14-0545RSL
CORPORATION, )
)
                Plaintiff, ) ORDER DENYING DEFENDANT
     v. ) ARCH INSURANCE COMPANY'S
) MOTION FOR SUMMARY
ARCH INSURANCE COMPANY, *et al*, ) JUDGMENT
)
                Defendants. )

This matter comes before the Court on "Defendant Arch Insurance Company's Motion for Summary Judgment." Dkt. # 97. Arch is an excess insurer on a financial institution blended policy issued to Washington Mutual Bank ("WaMu") starting in May 2006. It seeks a summary determination (a) that the policies do not cover fraudulent mortgages originated prior to the policy period and/or (b) that the claimed losses are indirect and do not trigger coverage under the terms of the policy. WaMu collapsed in 2008, and the United States Office of Thrift Supervision placed it into receivership with the Federal Deposit Insurance Corporation ("FDIC"). The FDIC is pursuing a claim for insurance coverage that WaMu made in 2007. The FDIC opposes Arch's motion and requests that it be denied or, in the alternative, that the Court defer ruling under Fed. R. Civ. P. 56(d)(2).

ORDER DENYING DEFENDANT ARCH
INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 1

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude the entry of judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." Krechman v. County of Riverside, 723 F.3d 1104, 1109 (9th Cir. 2013). Although the Court must reserve for the jury genuine issues regarding credibility, the weight of the evidence, and legitimate inferences, the "mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient" to avoid judgment. City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1049 (9th Cir. 2014); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 925 (9th Cir. 2014). In other words, summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties,[1] the Court finds as follows:

---

[1] This matter can be decided on the papers submitted. Arch's request for oral argument is DENIED. Arch's request for judicial notice (Dkt. # 100) is GRANTED. The FDIC's request to strike evidence regarding WaMu's knowledge of the loan originators' fraud is DENIED. Arch's request to strike the Declaration of Peter C. Haley (Dkt. # 159) is GRANTED.

ORDER DENYING DEFENDANT ARCH
INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 2

## BACKGROUND

In the early 2000s, WaMu contracted with third parties to have them originate residential real property mortgage loans which WaMu agreed to purchase. In March 2004, WaMu discovered that a mortgage originated by CIP Mortgage Corporation was based on a misstatement regarding the borrower's income: the application showed annual income of approximately $150,000, but the relevant tax return showed income of less than $15,000. WaMu brought the problem to CIP's attention and initiated a broader review. By June 2004, WaMu knew of eleven loans, including two made to the Chief Executive Officer of CIP, that were based on false income statements. WaMu's Correspondent Area Risk and Risk Mitigation departments concluded "that the borrowers misrepresented their income and employment." Dkt. # 173-4 at 3. Persons involved in the loans, including CIP and its CEO, were placed on a list of "Suspect Parties," CIP was internally referred for further monitoring, and WaMu repurchased the loans it had sold to Fannie Mae. In July 2004, WaMu notified CitiMortgage that it had identified two more fraudulent loans originated by CIP. WaMu notified CIP of its findings and requested that it repurchase the loans. CIP agreed to do so and fired the processor who originated the loans. At approximately the same time, however, WaMu discovered that CIP's 2003 net worth was less than 1/10th what it had been in 2002, in large part due to a "huge distribution" to shareholders. Dkt. # 99 at 40-41. On September 2, 2004, WaMu notified CIP that its selling privileges for WaMu had been suspended.

Prior to September 2005, WaMu purchased three fraudulent loans from another mortgage company, Coastal Capital.

In the spring of 2006, WaMu's insurance broker negotiated changes to the blended policy underlying Arch's excess layer. The underwriters agreed to define the term "Loan Originator" and granted certain specified coverages related to their services, effective May 1, 2006. Pursuant to the policy in place in 2007-2008, the underwriters agreed to indemnify WaMu for "[l]oss

resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others." Dkt. # 1-1 at 25. An "individual and/or company[,] which originates mortgage loans purchased by the Insured" is an Employee under this coverage provision. Dkt. # 1-1 at 35.

On September 18, 2007, a defendant in a pending criminal matter notified WaMu that over 100 of the mortgages originated by CIP for WaMu were actually unsecured. WaMu conducted an investigation and found that CIP prepared fraudulent paperwork, including loan applications, mortgages, notes, and title insurance, to make it look like a third party was borrowing money that was secured by real property owned or controlled by CIP's CEO. In fact, the CEO and others involved in the fraud fronted just enough money to get through settlement, then sold the loans to WaMu and pocketed the proceeds without ever recording the mortgage, paying taxes, or purchasing insurance. The CEO and/or his companies would make monthly payments on the loan so that they appeared legitimate. The properties that were supposedly securing WaMu's loan were often sold to end-users, thereby compromising WaMu's position in the chain of title. WaMu concluded that it had purchased 124 fraudulent loans for $53,344,641.16. WaMu notified the underwriters of the loss on November 21, 2007.

**ANALYSIS**

The parties agree that the underlying bond is to be interpreted under Washington law. Insurance policies are construed "as contracts, giving them a fair, reasonable, and sensible construction as would be given to the contract by an average person purchasing insurance." Xia v. ProBuilders Specialty Ins. Co., 188 Wn.2d 171, 181 (2017) (internal quotations marks omitted).[2] Undefined terms are given their plain and ordinary meaning and, if the policy

---

[2] A fidelity bond is generally interpreted in the same manner as an insurance policy, with due consideration given to the requirements and purposes of any statute mandating the bond. Estate of Jordan by Jordan v. Hartford Acc. & Indem. Co., 120 Wn.2d 490, 497-98 (1993).

ORDER DENYING DEFENDANT ARCH
INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 4

language is clear and unambiguous, it will be applied as written. Id. Where there is an ambiguity, coverage provisions are liberally construed in favor of coverage while exclusions are strictly construed against the insurer. Ross v. State Farm Mut. Auto. Ins. Co., 132 Wn.2d 507, 523 (1997). If an insured shows that the loss falls within the coverage provision, the insurer must show that it is excluded by specific policy language. Moeller v. Farmers Ins. Co. of Wash., 173 Wn.2d 264, 272 (2011).

**A. Definition of "Employee"**

Arch argues that the losses at issue do not trigger the obligation to indemnify because, at the time CIP and Coastal Capital sold the fraudulent loans to WaMu, they were not "Employees" covered under the fidelity bond. Arch dedicates a significant amount of its memorandum recounting when WaMu became aware that CIP had sold it bad loans and when it ceased doing business with both loan originators. Based on this time line, Arch obliquely mentions that it would be unfair to force the insurers to cover a loss that was known, but undisclosed, when the coverage first went into effect. The "known loss doctrine" applies in Washington and can, in certain circumstances, bar recovery on an insurance claim for a loss that the insured subjectively knew had already or would occur. See Hillhaven Props. Ltd. v. Sellen Const. Co., Inc., 133 Wn.2d 751, 758 (1997). Arch does not, however, argue that WaMu knew, as a matter of law, that the loan originators had engaged in fraud (as opposed to negligence or recklessness) prior to May 2006. Arch is not, therefore, arguing that there was a known loss, but rather that the fidelity bond covers only losses caused by dishonest or fraudulent acts occurring during the policy period by persons who were then employed by WaMu.

Insurance coverage can be offered on an occurrence or a claims-made basis. "Occurrence policies generally provide coverage for damage that occurs during the policy period regardless of when the damage is discovered if notification is made within a reasonable time. . . . By contrast, claims-made policies generally provide coverage for claims which the insurer receives

notice of during the policy period regardless of when the damage occurred." Am. Continental Ins. Co. v. Steen, 151 Wn.2d 512, 517 (2004). Arch is implicitly arguing that WaMu purchased an occurrence policy and that, because the alleged fraud occurred long before the policy period began, there is no coverage. The express terms of the policy show, however, that WaMu purchased a claims-made policy. The general terms and conditions that apply to the fidelity coverage state:

> This Bond applies to loss in excess of USD 2,500,000 discovered by the Risk Management Department. Discovery occurs when the Risk Management Department first becomes aware of facts which would cause a reasonable person to assume that a loss in excess of USD 2,500,000 of the type covered by this Bond had been or will be incurred, even though the exact amount or details of loss may not then be known. Discovery also occurs when the Risk Management Department receives notice of an actual or potential claim in excess of USD 2,500,000 in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this Bond.

Dkt. # 1-1 at 18. In relevant part, the fidelity bond provides indemnification for "[l]oss resulting from dishonest or fraudulent acts committed by an Employee" with the intent to cause WaMu loss and to gain financial benefit for themselves. Dkt. # 1-1 at 25. Thus, the policy covers frauds that occurred before the policy went into effect as long as they were discovered by WaMu's Risk Management Department during the policy period. As noted above, Arch eschews any attempt to show that WaMu knew as of a particular date that CIP and/or Coastal Capital had defrauded it, as opposed to having merely been negligent or reckless. Nor does Arch point to any express policy language limiting coverage to losses caused by current employees or otherwise altering the claims-made nature of the coverage provided.

Arch argues that coverage must be limited to the fraudulent acts of current loan originators because the definition of "Loan Originator" is written in the present tense to include "any individual and/or company[] which originates mortgage loans purchased by the Insured." Dkt. # 1-1 at 35. First, the phrase "which originates" does not necessarily locate the event of

ORDER DENYING DEFENDANT ARCH
INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 6

origination in the present time. Although the specific form of the verb, originates, is said to be in the present tense, it does not follow that its use refers to present time. For instance, in the sentence "The train I am taking next week originates in Paris and runs through Munich," the verb forms are in the present tense, but in this particular context they refer to events in the future. In the context of the definition of "Loan Originator," "which originates" acts more as a qualifier rather than a temporal description. The phrase is broader than the present tense or, at the very least, is ambiguous and must be interpreted in favor of coverage. Second, Arch's interpretation would significantly alter and limit the discovery provision quoted above without any textual support. The discovery provision provides a clear promise of coverage for losses discovered during the policy period. If the insurers intended to carve out an exception to the discovery provision and limit coverage for loan originators to only those who would originate a mortgage loan and sell it to WaMu during an individual policy period, they should have and could have done so with much more clarity than a choice of verb tense in a subordinate definition of the definition of "Employee."[3]

**B. Causal Connection Between Fraud and Loss**

The insurers agreed to indemnify WaMu for "[l]oss directly resulting from the dishonest or fraudulent acts committed by an Employee . . ." with the intent to cause WaMu a loss and to obtain a financial benefit for themselves. Dkt. # 1-1 at 25. Arch argues that WaMu's losses were not directly caused by the loan originators' fraud, but rather by its contractual obligations to repurchase faulty loans sold to third parties. Although the factual record on this point is thin, the parties agree that WaMu sold most, if not all, of the loans it purchased from CIP and Coastal Capital to Fannie Mae and/or CitiMortgage and that it was contractually obligated to repurchase

---

[3] Arch's argument that the only losses covered are those caused by employees "with the intent [during the policy period] to cause the Insured to sustain" the loss is unavailing. Dkt. # 1-1 at 25. There is no temporal requirement, explicit or implicit, in the coverage provision. The Court will not read extraneous language into a coverage provision in order to limit coverage.

ORDER DENYING DEFENDANT ARCH
INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 7

the loans when the material representations and warranties it made about them proved to be false. Based on these facts, Arch argues that WaMu's loss was the direct result of the contractual repurchase obligations, not of the underlying fraud.

There is no definition of "resulting directly" in the policy. Washington cases interpreting "direct" in the context of insurance coverage define it as "without any intervening agency or step: without any intruding or diverting factor." Pinnacle Processing Group, Inc. v. Hartford Cas. Ins. Co., 2011 WL 5299557, at * 5 (W.D. Wash. Nov. 4, 2011) (quoting Moeller v. Farmers Ins. Co. of Wash., 155 Wn. App. 133, 143 (2010)). See also Hanson PLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, 58 Wn. App. 561, 573 (1990) (equating "result directly" with "proximate cause," meaning "a cause which in a direct sequence, unbroken by any independent cause, produced the injury complained of and without which such injury would not have happened."). It is undisputed that the loan originators intended to, and did, create a fake investment designed to separate WaMu from its money for their own financial benefit. A common sense understanding of the policy and the relationships between the entities involved shows that WaMu suffered a loss the moment it delivered funds to CIP and/or Coastal Capital and received worthless paperwork in return. It may have been able to reduce its losses over time when the scammers made payments and/or WaMu sold the loans to third parties, but it nevertheless suffered an initial loss in the amount it paid for the fraudulent loans directly resulting from the loan originators' fraud. Arch cites no policy language that would support the proposition that a direct loss of the type the policy was intended to cover becomes indirect simply because, at a later time, attempts at mitigation were unsuccessful.

Arch relies entirely on case law to support its argument that WaMu's losses were indirect, but these cases are distinguishable. In The Vons Cos., Inc. v. Fed. Ins. Co., 212 F.3d 489 (9th Cir. 2000), for example, Vons' apparent agent was part of a Ponzi scheme operated by an entity called Premium Sales Company. The agent took kickbacks from Premium in exchange for

confirming scam transactions which caused third party investors to continue investing in Premium. As the Ninth Circuit noted, "Vons, for its part, lost no money" as part of this scheme. 212 F.3d at 490. Vons' loss arose when it settled a claim brought by the investors for its failure to supervise its apparent agent and/or under a theory of vicarious liability. In contrast, WaMu was separated from its money as soon as it purchased the fraudulent loans CIP and Coastal Capital originated.

In Pinnacle Processing, 2011 WL 5299557, at * 5, the insurance policy covered losses arising from the theft of property "following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside your premises or from a banking institution or similar safe depository . . . ." The loss at issue arose when a merchant submitted requests for over a quarter million dollars in credit card refunds for its customers. The refunds were processed and credited to the cardholders' accounts, but when Pinnacle Processing went to recover the refunded amounts from the merchant, the request was dishonored. The bank that funded the refunds debited a reserve account Pinnacle maintained and, pursuant to the terms of its contract with the bank, Pinnacle was forced to replace the deducted funds. Not surprisingly, the court found the connection between the computer request for a refund and Pinnacle's contractual obligation to maintain and replenish a reserve fund too attenuated to be "direct."

In Universal Mortg. Corp. v. Württembergische Versicherung AG, 651 F.3d 759 (7th Cir. 2014), a claim was filed by a loan originator based on the fraud of its employee, Hightower, who ignored Universal's lending standards and accepted kickbacks to approve non-compliant loans. Universal sold the loans to third-party investors and sought coverage for amounts it ultimately had to pay to repurchase the loans. The Seventh Circuit held that "direct means direct," and that "the bond does not cover losses sustained by Universal as a result of third-party contract liability." Id. at 761-63. Of interest, however, is an alternative argument raised by Universal: that it had suffered a direct loss covered by the bond when it initially funded the loans. The court

noted that, "Universal may have suffered an actual, direct loss when it funded Hightower's noncompliant loans," but found that the proof of loss and the complaint showed that this was not, in fact, the loss for which Universal sought coverage. Id. at 763. In this case, the FDIC seeks to recover "the loan losses incurred by Washington Mutual from the CIP fraud . . . ; Washington Mutual's cost of funding the fake loans . . . ; and all other relief that may be afforded under the financial institution bond insurance policies and applicable law." Dkt. # 1 at ¶ 4. The underlying claim for coverage was "for a loss sustained in the amount of $53,344,641.16 and expenses as a result of the fraudulent scheme perpetrated by [CIP's CEO]." Dkt. # 173-2 at 4. Arch does not point to any portion of the proof of loss or the complaint wherein the FDIC seeks coverage for the costs of repurchasing the fraudulent loans. Even if the Court assumes that "direct means direct" under Washington law, the claimed loss resulted immediately and without intervening cause from the loan originators' fraudulent acts. It is, therefore, direct.[4]

**C. Exclusion of Indirect or Consequential Loss**

Arch argues that Exclusion (v) of the financial institutions' bond, which precludes coverage for "indirect or consequential loss of any nature," applies in this case. As discussed above, however, the FDIC seeks coverage for losses resulting directly from the loan originators' fraud.

//

//

---

[4] Direct Mortg. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 625 F. Supp.2d 1171 (D. Utah), and RBC Mortg. Co. v. Nat'l Union First Ins. Co. of Pittsburgh, 812 N.E.2d 728 (Ill. App. 2004), are similarly distinguishable.

1        For all of the foregoing reasons, Arch's motion for summary judgment (Dkt. # 97) is
2 DENIED.

4        Dated this 13th day of November, 2017.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

ORDER DENYING DEFENDANT ARCH
INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT - 11