UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> ARCH INSURANCE COMPANY, *et al*, <br><br> Defendants. | Civil Case No. C14-0545RSL <br><br> ORDER GRANTING IN PART UNDERWRITERS AT LLOYD'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on "Defendants Those Certain Underwriters at Lloyd's, London Whose Names are Severally Subscribed to Excess Financial Institution Bond No. 509/QA015607 ("The Excess Bond") and Württembergische Versicherung A.G. (Collectively, "Underwriters") Motion for Summary Judgment." Dkt. # 120. The Underwriters are excess insurers on a financial institution blended policy issued to Washington Mutual Bank ("WaMu") starting in May 2006. They seek a summary determination (a) that their excess layer has not been reached, (b) that the claimed losses are indirect and do not trigger coverage under the terms of the policy, (c) that the policies do not cover fraudulent mortgages originated prior to the policy period, and/or (d) that the claims for cost of funds, prejudgment interest, and attorney's fees fail as a matter of law . WaMu, the insured, collapsed in 2008, and the United States Office of Thrift Supervision placed it into receivership with the Federal Deposit Insurance

ORDER GRANTING IN PART
UNDERWRITERS AT LLOYD'S
MOTION FOR SUMMARY JUDGMENT - 1

1  Corporation ("FDIC"). The FDIC is pursuing a claim for insurance coverage that WaMu made
2  in 2007. The FDIC opposes the Underwriters' motion and requests that it be denied or, in the
3  alternative, that the Court defer ruling under Fed. R. Civ. P. 56(d)(2).

4  Summary judgment is appropriate when, viewing the facts in the light most favorable to
5  the nonmoving party, there is no genuine issue of material fact that would preclude the entry of
6  judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial
7  responsibility of informing the district court of the basis for its motion" (Celotex Corp. v.
8  Catrett, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that
9  show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving
10 party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to
11 designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S.
12 at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . .
13 and draw all reasonable inferences in that party's favor." Krechman v. County of Riverside, 723
14 F.3d 1104, 1109 (9th Cir. 2013). Although the Court must reserve for the jury genuine issues
15 regarding credibility, the weight of the evidence, and legitimate inferences, the "mere existence
16 of a scintilla of evidence in support of the non-moving party's position will be insufficient" to
17 avoid judgment. City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1049 (9th Cir. 2014);
18 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Factual disputes whose resolution
19 would not affect the outcome of the suit are irrelevant to the consideration of a motion for
20 summary judgment. S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 925 (9th Cir. 2014). In other
21 words, summary judgment should be granted where the nonmoving party fails to offer evidence
22 from which a reasonable jury could return a verdict in its favor. FreecycleSunnyvale v. Freecycle
23 Network, 626 F.3d 509, 514 (9th Cir. 2010).

25 //

26

Having reviewed the memoranda, declarations, and exhibits submitted by the parties,[1] the Court finds as follows:

**BACKGROUND**

In the early 2000s, WaMu contracted with third parties to have them originate residential real property mortgage loans which WaMu agreed to purchase. In March 2004, WaMu discovered that a mortgage originated by CIP Mortgage Corporation was based on a misstatement regarding the borrower's income. Subsequent investigation revealed eleven CIP loans that were based on false income statements. WaMu's Correspondent Area Risk and Risk Mitigation departments concluded "that the borrowers misrepresented their income and employment." Dkt. # 173-4 at 3. WaMu notified CIP of its findings and requested that it repurchase the loans. CIP agreed to do so and fired the processor who originated the loans. At approximately the same time, however, WaMu discovered that CIP's 2003 net worth was less than 1/10th what it had been in 2002, in large part due to a "huge distribution" to shareholders. Dkt. # 99 at 40-41. On September 2, 2004, WaMu notified CIP that its selling privileges for WaMu had been suspended.

Prior to September 2005, WaMu purchased three fraudulent loans from another mortgage company, Coastal Capital.

On September 18, 2007, a defendant in a pending criminal matter notified WaMu that over 100 of the mortgages originated by CIP for WaMu were actually unsecured. WaMu conducted an investigation and found that CIP prepared fraudulent paperwork, including loan applications, mortgages, notes, and title insurance, to make it look like a third party was borrowing money that was secured by real property owned or controlled by CIP's CEO. In fact, the CEO and others involved in the fraud fronted just enough money to get through settlement,

---

[1] This matter can be decided on the papers submitted. The Underwriters' request for oral argument is DENIED.

then sold the loans to WaMu and pocketed the proceeds without ever recording the mortgage, paying taxes, or purchasing insurance. The CEO and/or his companies would make monthly payments on the loan so that they appeared legitimate. The properties that were supposedly securing WaMu's loan were often sold to end-users, thereby compromising WaMu's position in the chain of title. WaMu concluded that it had purchased 124 fraudulent loans for $53,344,641.16. WaMu notified the Underwriters of the loss on July 18, 2008.

On April 11, 2014, the FDIC filed this litigation in its capacity as the Receiver for WaMu against the third and fourth excess layer insurers. The FDIC alleged that it had covered losses of over $25 million after reducing the claim by the amount recovered by third parties and its self-insurance obligations. A more detailed calculation of the damages, including specific categories of losses for which coverage is sought, was disclosed in November 2014 pursuant to Fed. R. Civ. P. 26(a). The discovery cut off date is February 4, 2018.

## ANALYSIS

The parties agree that the underlying bond is to be interpreted under Washington law. Insurance policies are construed "as contracts, giving them a fair, reasonable, and sensible construction as would be given to the contract by an average person purchasing insurance." <u>Xia v. ProBuilders Specialty Ins. Co.</u>, 188 Wn.2d 171, 181 (2017) (internal quotations marks omitted).[2] Undefined terms are given their plain and ordinary meaning and, if the policy language is clear and unambiguous, it will be applied as written. <u>Id.</u> Where there is an ambiguity, coverage provisions are liberally construed in favor of coverage while exclusions are strictly construed against the insurer. <u>Ross v. State Farm Mut. Auto. Ins. Co.</u>, 132 Wn.2d 507, 523 (1997). If an insured shows that the loss falls within the coverage provision, the insurer must

---

[2] A fidelity bond is generally interpreted in the same manner as an insurance policy, with due consideration given to the requirements and purposes of any statute mandating the bond. <u>Estate of Jordan by Jordan v. Hartford Acc. & Indem. Co.</u>, 120 Wn.2d 490, 497-98 (1993).

ORDER GRANTING IN PART
UNDERWRITERS AT LLOYD'S
MOTION FOR SUMMARY JUDGMENT - 4

show that it is excluded by specific policy language. Moeller v. Farmers Ins. Co. of Wash., 173 Wn.2d 264, 272 (2011).

**A. Ripeness**

The Underwriters issued an insurance policy to WaMu in excess of $30 million in self-insured retention and $75 million in four underlying policy layers. The Underwriters argue that, although the first three layers of insurance coverage have been exhausted, the FDIC has $29 million in self insurance and the $20 million policy offered by Arch and National Union remaining before the Underwriters could possibly have an obligation to pay under the policy. They seek dismissal of the two claims the FDIC has asserted against them: breach of contract and declaratory judgment.

**1. Breach of Contract**

The Underwriters seek dismissal of the breach of contract claim on the ground that, because the FDIC has not exhausted the Arch and National Union policy limits, it is not ripe for adjudication. Liability typically attaches under excess policies "only after the primary coverage is exhausted." Diaz v. Nat'l Car Rental Sys., Inc., 143 Wn.2d 57, 63 (2001). In this case, the excess policy specifically states that the "Underwriters' liability to pay under this Policy shall attach only when the Underlying Insurer(s) shall have paid or have been held liable to pay, the full amount of the Underlying Limit(s) . . . ." Dkt. # 1-4 at 7. The insurers on the risk in the third level of coverage, Arch and National Union, have denied coverage, and their liability has not yet been established. The Underwriters correctly argue that their duty to indemnify has not yet been triggered, much less breached. Because the undisputed facts show that there is no present duty to indemnify, the FDIC's breach of contract claim against the Underwriters is not ripe and will be dismissed without prejudice. See Seattle Times Co. v. Nat'l Surety Corp., 2016 WL 3033498, at *2-4 (W.D. Wash. May 27, 2016).

**2. Declaratory Judgment**

The FDIC also seeks a number of declarations under 28 U.S.C. § 2201, in particular that the Underwriters must cover all losses that WaMu suffered in excess of the applicable retention limits as a result of the dishonest acts of its loan originators.[3] The Underwriters argue that the request for declaratory relief is not ripe because WaMu's claimed losses do not, in fact, exceed the remaining retained amounts and will never exceed those amounts. The Underwriters rely on the following calculation:

| | | |
|---|---|---|
| $53.34 million | | sworn proof of loss |
| - $5.28 million | | recovered from third parties |
| $48.06 million | | outstanding value of claim |

At the time the complaint was filed, there was $49 million in self-insurance and policy limits left below the Underwriters' fourth layer of excess coverage. Based on those numbers, the Underwriters seek dismissal of the FDIC's request for a declaration of coverage on the ground that they are not currently, and will never be, on the risk.

Although there is no hard and fast rule, courts generally find that a claim against an excess insurer is ripe for adjudication if there is a substantial, reasonable, and/or practical likelihood that the dispute will trigger the excess policies. Warren v. Am. Bankers Ins., 507 F.3d 1239, 1241 (10th Cir. 2007); E.R. Squibb & Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154, 177-78 (2nd Cir. 2001); Century Indem. Co. v. Marine Group, LLC, 848 F. Supp.2d 1229, 1237 (D. Or. 2012); Ross Dev. Corp. v. Fireman's Fund Ins. Co., 809 F. Supp.2d 449, 461-62 (D.S.C. 2011); Tocci Bldg. Corp. of N.J. v. Va. Sur. Co., 750 F. Supp.2d 316, 321-22 (D. Mass. 2010). The Underwriters' calculation of damages is based primarily on a proof of loss submitted almost a decade ago and a letter from the FDIC notifying the Underwriters that it had collected

---

[3] To the extent the FDIC seeks a declaration that the Underwriters are obligated to immediately indemnify the FDIC for all such losses, the claim is premature for the reasons stated in Section A.1.

approximately $5.28 million from the loan originators as of the end of 2015. The Underwriters ignore the allegation in the complaint that the FDIC has $25 million in losses and many of the details the FDIC provided regarding its damages during discovery. The FDIC's calculation of damages contains additional elements beyond the total stated in the proof of loss and reduces the gross third-party recoveries by the costs of obtaining them. The calculation is as follows:

| | | |
|---|---|---|
| | $53,279,310.58 | unpaid principle balance on 124 fraudulent loans |
| | +$1,292,685.71 | Claims Expenses recoverable under Insuring Agreement G |
| | +$2,023,138.97 | costs of borrowing the money used to purchase the loans |
| | $56,595,135.26 | |
| | - $5,022,648.97 | net amount recovered from third parties |
| | $51,572,486.29 | outstanding value of claim |

This total must be reduced by the $29 million self-insured retention and the $19,662,094.16 remaining under the Arch and National Union layer, leaving $2,910,392.13 against the Underwriters' policy. Thus, under the FDIC's calculation, the losses directly resulting from the loan originators' fraud will exceed the retained and underlying limits by almost $3 million, thereby triggering the fourth excess coverage layer.

The Underwriters take issue with the admissibility and/or persuasiveness of some of FDIC's proof, arguing that the FDIC failed to amend its initial disclosures to reflect the numbers presented in its opposition memorandum[4] and that it has not proven the extent of or its

---

[4] Rule 26(e)(1) requires parties to "supplement or correct" their initial disclosures as discovery progresses if additional or corrective information becomes available. The FDIC's claim for "Claims Expenses" and costs of funds as part of its damage calculation has been disclosed. The Underwriters offer no support for their insistence that the initial disclosures be formally amended. Regardless, discovery is on-going, and the Court declines to exclude evidence under Rule 37 simply because defendants filed dispositive motions before all disclosures were due. Because the Underwriters' request to strike or exclude is overruled, the FDIC's motion to file a supplemental memorandum (Dkt. # 174) is DENIED as unnecessary.

entitlement to Claim Expenses and/or borrowing costs. In the context of this ripeness challenge, the Court's task is to ascertain whether the likelihood that the excess policies will be triggered is sufficient to confer jurisdiction with respect to the request for a coverage declaration. That standard is met here. The FDIC specifically alleged that it had over $25 million in insurable losses in excess of the self-insured retention and the first three layers of coverage and has produced evidence in support of its calculations. Even if the Court assumes for purposes of the jurisdictional analysis that the costs associated with funding the loans, which total $2,023,138.97, are not covered and/or not proven, the FDIC's claimed loss still exceeds the $48,662,094.16 in self-insurance and excess coverage still remaining. The Underwriters knew since at least November 2014 that the FDIC intended to claim Claims Expenses under the policy. Instead of seeking a determination regarding coverage for those expenses, the Underwriters ignored their existence when filing their motion, preferring to focus only on the 2008 proof of loss, one of many disclosures made during discovery, and the costs of funds claim. The Underwriters cannot, in reply, seek a declaration regarding coverage that they avoided seeking in their motion.

The FDIC has claimed and provided evidence that the dispute will trigger the fourth excess layer. If the Underwriters believe that the FDIC's expansive view of Claims Expenses is incorrect, they may file an appropriate motion to limit the value of the claim. At this point, however, there is a substantial likelihood that the policy will be triggered. The Court also finds that the exercise of jurisdiction under the Declaratory Judgment Act promotes judicial economy and the just, speedy, and comprehensive resolution of this dispute. Given the existence of an actual case and controversy (as discussed above), the Underwriters' continued participation and concomitant ability to protect their interests is not unfair compared to the likely unfairness and inefficiencies that would arise if they were dismissed. For these reasons, the court elects to exercise its discretion to entertain declaratory relief.

**B. Definition of "Employee" and Causal Connection Between Fraud and Loss**

For the reasons stated in the "Order Denying Defendants Arch Insurance Company's Motion for Summary Judgment," of even date, the Underwriters' adoption of the arguments made by Arch and National Union are unavailing.

**C. Cost of Funds Loss**

The insurers agreed to indemnify WaMu for "[l]oss directly resulting from the dishonest or fraudulent acts committed by an Employee . . ." with the intent to cause WaMu a loss resulting in a financial benefit for themselves. Dkt. # 1-1 at 25. The Underwriters argue that the expenses WaMu incurred to borrow the funds it used to purchase the fraudulent loans were not directly caused by the loan originators' fraud and do not satisfy the intent and financial benefit elements of the coverage provision. In addition, the Underwriters argue that the FDIC has failed to raise a genuine issue of material fact regarding whether WaMu actually sustained costs associated with funding the loan purchases. Both arguments have merit.

With regards to loans, the financial institutions' fidelity bond covers only direct losses resulting "from dishonest or fraudulent acts committed by an Employee with the intent to cause the Insured to sustain such loss and which results in a financial benefit for the Employee . . . ." Dkt. # 1-1 at 25. The FDIC does not allege, nor is there any evidence that would give rise to a reasonable inference, that the loan originators intended to cause WaMu to suffer the claimed loss, *i.e*, the cost of funds loss. Whether WaMu borrowed money in order to purchase one or more loans from CIP or whether it used its own money to make the purchases is unclear, but there is no reason to believe that CIP cared one way or the other. The Underwriters expressly pointed out the lack of evidence regarding an issue on which the FDIC has the burden of proof, and the FDIC has failed to come forward with evidence showing that there is a genuine issue of material fact regarding the loan originator's intent. In these circumstances, the FDIC cannot avoid summary judgment by claiming that it was the Underwriters' burden to prove a lack of

1 intent.

2       The Underwriters also point out that there is no evidence showing that WaMu actually incurred any borrowing costs associated with the purchase of the 124 loans. The FDIC offers a declaration showing only that banks in WaMu's position could choose to fund loan purchases by borrowing: there is no evidence that WaMu actually did so. A bank can choose to make an investment using its own funds, using its depositors' funds, or using funds it borrowed for that express purpose. In the first scenario, there would be no additional outlay of cash and any costs associated with the use of the funds would be appropriately characterized as an opportunity cost. In the second scenario, the funds were, presumably, already on deposit with the bank and were entitled to a pre-determined interest rate regardless of whether the funds were invested. In the last scenario, the costs of borrowing might give rise to losses that would not otherwise have been incurred related to the funding of the fraudulent loans. We have no information regarding WaMu's actual funding choices, however. The FDIC simply multiplies the outstanding balance on the loans by an amalgamated "Cost of Funding Earning Assets," which is apparently the total interest expense WaMu paid on all deposits and other borrowed money as a percentage of its average earning assets during the time it held the fraudulent loans. The FDIC makes no effort to show how WaMu actually funded the purchase of the loans or to calculate the actual costs thereof. It cannot go to a jury based on nothing more than averages and speculation.

## D. Prejudgment Interest

      Under Washington law, a court may award prejudgement interest if a claim is "liquidated," meaning that the evidence allows the computation of damages with exactness, without recourse to opinion or discretion. <u>Weyerhaeuser Co. v. Commercial Union Ins. Co.</u>, 142 Wn.2d 654, 685 (2000). It is undisputed that the Underwriters have no liability under the policy at present. This is not simply a defense against the FDIC's claim, but an acknowledgment that there are no amounts past due on which interest could accrue. The Court declines to dismiss the

claim for prejudgment interest, however. If Arch and National Union were to pay their policy limits during the course of this litigation and the Underwriters continued in their refusal to provide coverage, a verdict in the FDIC's favor could include a time-limited award of prejudgment interest.

**E. Attorney's Fees**

The Court reserves the issue of whether the FDIC may recover attorney's fees from the Underwriters under <u>Olympic S.S. Co., Inc. v. Centennial Ins. Co.</u>, 117 Wn.2d 37 (1991).

For all of the foregoing reasons, the Underwriters' motion for summary judgment (Dkt. # 120) is GRANTED in part and DENIED in part. The FDIC's claim for recovery of the costs of borrowing the funds used to purchase the fraudulent loans is DISMISSED. The remaining claims may proceed. The FDIC's motion for leave to file a sur-reply (Dkt. # 174) is DENIED.

Dated this 13th day of November, 2017.

*Robert S. Lasnik* (signature)

Robert S. Lasnik
United States District Judge